Punitive damages under Arizona law is an extraordinary civil remedy reserved for the most egregious of wrongs. And among other things, what the plaintiff has to prove to recover punitive damages is that the conduct that justifies the award was a proximate cause of the harm. And to be a proximate cause of the harm, the conduct has to help produce the harm, and it has to be conduct without which the harm would not have occurred. Here, the plaintiff didn't meet that burden. Other than punitive damages, the plaintiff recovered only contract damages, and contract damages flow from the breach of contract. But there were also some bad faith activities from which the jury could have found the sort of mental state that's required. Even though there were instances where information was refused, payments were not made even for undisputed items of coverage and so forth. And I guess what I would like to know from you is whether it's your contention that an intent to injure has to be something beyond injure economically, or whether if there's an intent to injure, it can be an intent to injure economically. Well, I think that an intent to injure economically would be sufficient, although I do not agree. Under Rawlings, right? Under the Rawlings case? Well, yes, but that's more, Rawlings is not just a simple dispute over the value of a claim. Rawlings has some very particular facts. And honestly, even the Rawlings court didn't decide the issue. They remanded it back to the trial court for a decision. So while there are circumstances where I think it would be sufficient, I don't think those are the circumstances here. But, you know, a couple of answers. I mean, the plaintiffs claim that, for example, you conceded that the swimming pool was covered, and yet you wouldn't provide any damages for that, or that the debris removal was covered, but you didn't provide anything for debris removal. What do you say as to those two specific points? Well, both of those issues were a little bit unclear or confused. The swimming pool issue, there was testimony, I believe, from the adjuster, Kelly Deque, and possibly the underwriter, Diana Cannon or Diana Thomas, her name appears both ways in the record, that the swimming pool was associated with the single-story building, and Delos had concluded that there was no coverage for that building. It was on the hotel policy because it represented a liability risk for the hotel. The specific request for admission that I believe at least the trial court's decision was based on in part incorporates the term casualty. And casualty in the insurance parlance, at least as I understand it, refers to liability claims. So it was the product of perhaps an awkward answer to an awkward request for admission, but there was contrary evidence to explain why the pool wasn't inspected and why it wasn't. Except counsel, in the posture that the case reaches us now, where your claim is one of insufficient evidence, don't we have to take all inferences in favor of the verdict and not in favor of your client? Yes, that's true. And I also, am I also correct in thinking that the challenge here is only to the evidence and not to the charge to the jury? That's correct. Okay. So we're only looking at whether a reasonable jury applying Arizona law could have awarded the amount that they did? Well, yes and no. I mean, I think if some of the Arizona cases, and many of them are cited in the even this Court's decision in Lange, if they teach us anything, they teach us that punitive damages can be tough for juries and judges. They get them wrong. And that's why the Court plays such an important gatekeeper role on this issue. It has to review the evidence. It has to compare it to the State law standard to award punitive damages, as well as the due process standard for the amount. All right. What about, what is your response? I noticed the lawyers for Glendale put in a supplemental authority citing the case of what is it, Arellano v. Primerica Life Insurance? Yes. Saying, oh, well, the Arizona Court of Appeals says ratios of 4 to 1 are fine. How do you distinguish that case? Well, the Arellano case is interesting because while the Court upheld the 4 to 1 ratio, it also discussed briefly whether or not contract damages would be considered in factoring the ratio. And while ultimately the Court's conclusion was that the plaintiff had waived the argument, there was certainly an indication that the contract damages wouldn't count. In fact, we cite a California case. It's the Major v. Western Home Insurance case where California makes that pretty clear, that in the context of that due process analysis, contract damages are not considered, that the ratio for punitive damages to compensatory damages has to focus on the tort damages. Here, there were no tort damages. So, right. So is it your position, then, that no matter how much in bad faith an insurance company's failure to pay could be that under Arizona law there can be no punitive damages? We know we have a contract with you, but we don't care. We're not going to pay you anything. Take us to court. And, yeah, we know it's covered, but not our problem. Are you saying that that's not a proper subject for punitive damages under Arizona law? Well, it would be if it could satisfy the proximate cause requirement. And that is really the hangup. The Arizona courts have said that the conduct that justifies the punitive damages award must be a proximate cause of harm. And if the breach of contract is the only thing that causes the harm, then no punitive damages would not be appropriate, as they typically are not, for cases involving breaches of contract. And here you're right. Can you remind me, just sorry, over here. I'm just looking at the verdict form. And I see what you're saying, that the jury said that your client did act in bad faith, but nonetheless awarded zero damages, zero additional damages for business interruption. So how was the jury instructed on the category of compensatory damages, which is addressed in the paragraph above? Was it – was compensatory damages defined just as breach of contract damages, or were there other components of bad faith conduct that could have filtered into the $144,000 or $383,000 figure? No. The compensatory damages were strictly the contract damages. In fact, there's a discussion when we were settling the jury instructions with the trial court judge where she even pointed out that, you know, the compensatory damages under the first count and the compensatory damages in that first slot there for the second count would be exactly the same. And here, the compensatory damage award would have been exactly the same, even if the jury hadn't found bad faith. Why were bad faith – why were damages for bad faith limited just to business interruption damages? Those were the only tort damages where there was any evidence offered. This is a business, so it didn't – it didn't sustain any emotional damage. There wasn't any evidence related to credit harm or anything like that. It was simply a dispute between two businesses, and the only thing that went beyond what was covered or what at least arguably fell under the policy were two years of additional business interruption that the plaintiff put on evidence and the jury rejected. Your – your argument – I guess I'm trying to understand the causation principle. Your argument is that if that figure ends up being zero, you can't have any punitive damages award whatsoever? Correct. Because if that number is zero, then whatever conduct was established beyond the breach of contract, whatever it was that went to the bad faith or whatever it was the jury felt justified the punitive damages award, it can't be a proximate cause of any harm. Except that seems contrary to the Rawlings case, at least as I understood it, where the fact that the insurer refused to provide information for the benefit of the insurance processing of the loss – excuse me – with the intent – I'm so sorry – of reducing recovery would warrant punitive damages. So how is that consistent with what you're saying? Well, again, Rawlings – that's okay. I can wait. Rawlings doesn't actually decide that issue. Rawlings refers it back to the trial court to let the trial court decide that issue. Which again found punitive damages, correct? Well, again, I noticed that that is added in the briefing, although I'm not sure that a trial court's decision based on facts and a record that we don't have is really authority. No, but in theory, but the appellate decision says in theory withholding information which would allow you to process your contractual claim can support punitive damages. So I have difficulty squaring that general principle with your argument here. Well, I'll have to disagree on your reading of Rawlings because Rawlings is not a contractual claim. The information that was withheld there was information that was promised to the insured, which is unlike our case. It was information that the insured needed to prosecute a claim against his neighbor. Who had started the fire. Who had started the fire. The insurance company had actually paid Rawlings everything he was owed under the policy. This was information that they promised him to help him with his other claim against his neighbor, and they never came through. They never delivered on the promise. They had the report. I recall in Rawlings, I think that Rawlings' lawyer contacted Farmers and was told the report wasn't going to be provided because it contained nothing of interest. That's correct. When, in fact, the insurance company knew that that policy of the neighbor's was the same policy, I mean, the same issuer and would have covered the damage to Rawlings, right? That's correct. I believe the report in that case would have established the neighbor's liability. It would have been a great help to Rawlings there. It's like more of an affirmative concealment or misleading, I guess, of the plaintiff's claim. Well, perhaps misleading. I believe the Court said that the carrier tried to destroy his the claim that Mr. Rawlings had against his neighbor. That's not the case we had here. Here, Bellows didn't divulge its reports, but it gave the reasons why. What? Was it just a work product claim? Work product, attorney-client privilege. This was not an ordinary claim. I mean, there was a big coverage issue right out of the box. There was hostility right out of the box. Everybody hired counsel right out of the box. They had reason to suspect that this was going to be litigated. And it was. I have another question for you. As I read your opening brief, you did not argue that the evidence was insufficient because the underlying damages were contractual in nature. I thought you were arguing that there was no evidence of the mental state required. So is that a different argument that you're making today? No. The argument, it's not the centerpiece of either the opening brief or the reply brief. I'll grant you that. But it is in there and it is part of. Where? I would have to get the opening brief. Well, maybe when you come up for rebuttal, because I guess part of what I'm struggling with is I don't actually recall this specific argument having been presented to us previously. Okay. I will see if I can find it. It's definitely in the reply brief. In the conclusion, I believe. Well, that's not where it has to be under our rules. It has to be in the opening brief. And I believe it's in the opening brief as well. Okay. It may very well be. I may be overlooking it. But to get to your other point, yes, we are also arguing that in general, although the plaintiff has many criticisms of the way the insurance company handled this case, without exception, the criticisms or the starting point that have been established by the evidence doesn't justify the conclusion that the insurance company acted with an evil mind or acted outrageously. There were explanations given for what was done and most often those explanations were undisputed. You have about a minute. And I will reserve that for rebuttal. You may do so. Thank you. We'll hear from Mr. Sampson. Good morning, Your Honors. And may it please the Court, I'm Mark Sampson. I represent Glendale on 27th. I think, Judge Graber, you hit it on the head. This whole proximate cause argument is a new creature. But it's still wrong. And let me tell you why. Judge Watford, you had looked at and you saw how these damages went out. There's not a denial of damages for bad faith. There's the same as the contract damages for the bad faith. Well, your opponent says that's not — I didn't look at the jury instructions, but your opponent says that's not the way the jury was instructed. It was instructed that the compensatory damages that are awarded in that first year should be a breach of contract damages. But do you dispute that? I was there. I don't. I do. I think he was there, too. I agree, Your Honor. That's what makes these — that's why we're all here. Yes. But, no, we do disagree on that. And the difference — business interruption was in both. But Mr. McCarthy correctly said the reason that it had a separate line in the punitive damages was that the coverage was limited the first year under the policy. And, therefore, that could have been an additional bad faith damage. And Judge Graver hit it. In your simile, well, can they just say, yes, we've got a contract, no, we're not going to do anything about it, but you can't do — you can't get any damages if you're a corporation, unlike a person who has to go through the hassle of it? But that is the damage. You've got to wait four years and litigate, you know, not just through the trenches, but over land, under land, and through the jungle to get paid. That's bad faith. This whole tort exists mostly for the insurance company contract. Their opening brief, rather than stressing proximate cause, is all about this ordinary commercial dispute. That's wrong on the legal level and the factual level. The first is, this isn't two businesses. This is insurer and insured. And that's closely governed because of the power of insurers to make sure that equal treatment is given to the other party. That's not an ordinary commercial dispute. And then, additionally, when you turn to the facts of it, I won't go through — the briefing, I think, captures most of the things, but I do want to point out two very important things. This ordinary adjustment, they sent Tyler Brett right after the storm with the glass, with the debris in the parking lot, with all the ground still wet. And the testimony, the evidence in the record that hasn't been appealed was capable of the jury drawing that he said, boy, this is a million-dollar claim. I'll try and get you $200,000 right now to get started. And he disappeared. He never showed up again. They changed him out. That wasn't a story they liked. And they didn't call him at trial. The number one adjuster that they assigned to go out there when everything's fresh, before Glendale has to start fixing stuff. But the fact is, the jury only found 144,000 of damages. So the fact that this guy said it was a million-dollar claim — Oh, I'm not claiming that. I'm just talking, Your Honor, about is that the way a claim adjustment happens? That you send the first adjuster out. He says favorable things to the insurer. And the next adjuster is, in fact, Mr. McCarthy. They go lawyer up. And after that, we see the things that I think Judge Graber was talking about in the record. I'll give a couple. The HSB electrical equipment inspection. First of all, it doesn't take place until November after an August storm. So we've been having to fix everything to keep the hotel running. And they find out, and they write a report to Delos. The insurer is saying it's an electrical grid surge, as opposed to a direct lightning strike. That could be true. But that, Delos, is covered under your policy. They were a reinsurer of certain electrical events. And what did we hear? HSB's inspection is done. There's no coverage. We never hear that they said you should find out if it's what the insured said. And the other one, although it seems trivial, but in terms of the mental state, HSB is supposed to do, you know, the big hotel sign up front. They don't get a lift. They tell Delos. We didn't inspect the sign. Did we hear, oh, we'll get to it later when Delos communicates with us? No. We hear an affirmative statement that it's just because of burned-out light bulbs. There's no damage. That's the record that piled up. And that's why we say that Judge Bolton and Judge Gilmour, who had both heard summary judgment motions, were right to send it to the jury. The jury, with, again, Judge Graber, you've got the proper standard. Every inference in our favor, and then only if you could say nobody could look at that and find out that this was the kind of deceitful misadjustment, intentional, that qualifies for punitive damages. And also not under appeal, we had J. Michael Lowe. I put him on at trial. He's a past director of the Arizona Department of Insurance. All the stuff you've seen in the briefs of both sides' version of those events, that's what he reviewed for his expert opinion. And he said about the adjustment, this was unreasonable and intentional. So to overturn this jury's verdict, they heard that kind of a past president, or past director, excuse me, of the insurance department give them that opinion. They had all that evidence that you see laid out. And Mr. McCarthy's burden is to prove to you that the only rational thing that they could, or decision they could come to, giving all the inferences to us, is that that was just an ordinary business transaction. Can I ask a question just that more out of curiosity than anything else? Sorry. Can I ask a question more out of curiosity than anything else? Certainly. At trial, I mean, it seemed like a number of the things you relied on to establish the evil mind were actions that your opposing counsel took during the course of the Am I getting that right? Because I thought I saw Mr. McCarthy's name on a lot of the communications. And I just wondered, how did that work in front of the jury? You can see, I think Mr. Kilgore, my partner in our responsive brief, handled it in quite a bit of detail. Mr. McCarthy was in the case. And so it arose later, did he need to not be trial counsel? And Judge Gilmour had said, she still had it then before it went back for trial. And it said a very, a set of principles, you know, what Mr. McCarthy can do, where he shall not go. Obviously, he can't comment on the evidence with the benefit of being a participant in it, that. So she tried to, because they wanted to use Mr. McCarthy for trial. And so there were guidelines put in place that are set up. But am I remembering right that, I mean, a number of the things you, again, relied on to get the jury to award punitive damages, where you basically said, Mr. McCarthy lied to my client in some of these communications.  The letters were there. It was not an anti-Mr. McCarthy trial. No, no, no. I'm just saying that the letters, though, what you were saying is that part of the reason why you should hit these guys with punitive damages is because they affirmatively lied to us about what they had, what tests showed, what, you know, right? And those letters came from your opposing counsel. I just, that seemed very odd. Your Honor, it has never happened to me, I'll tell you that. But if it were an ordinary witness, that is the stuff of punitive damages. This is a, this is a letter that misrepresents what we now find through discovery actually was going on. It was not, it was not turned into an anti-lawyer trial, if that was your concern. I think that would have been a bad strategy. Mr. McCarthy seems like a very reasonable man to me, judging by what we've seen today. He is, but we did not, I don't think it, it, I don't think that side issue really played into anything that happened in the courtroom. Let me ask you this. There are three Arizona Supreme Court cases where they, the Supreme Court reversed jury verdicts that granted punitive damages. I mean, I guess there's a case, I don't know if I'm pronouncing, Linthicum in 1986, Fulaski, and Garul, all reversed jury verdicts that awarded punitive damages. In some of those, there's a statement in, I guess, Garul, that the fact that the insurance company acted in its own self-interest was not considered evidence of an evil mind. Now, I mean, how do you distinguish those three cases? Your Honor, I think that what the, what the standard has evolved to is the instruction that was given, which it can either be malice and ill will, which was not, that's the, the middle component. The first is intentional conduct, and the third from Bradshaw, which comes after both Linthicum and the other case, Garul. And Bradshaw is sort of, it's the basis of the RAGI-5, the Recommended Arizona Jury Instruction on Punitives, which is what Judge Bolton, who was also priorly a state court judge, gave in this case properly. And the final one is acting to serve one's own interests and disregarding a chance of significantly affecting interests of the other. I mean, is there any single case you can cite to us where the Arizona Supreme Court has authorized punitive damages in a commercial dispute where there was no personal injury? Yeah. Rawlings is a, I mean, it's an individual, but it's Mr. Rawlings' dairy business. All right. But Rawlings And I think in Strawn, Winston v. Strawn, I don't have that cite, but I think it may be in the, it is mentioned in many of the cases you've been reading and that were here. Right. But Rawlings was the case where the insurance company deliberately withheld a report and said, oh, you don't need this, there's nothing of significance of interest to you. And in fact, that was an out-and-out lie. And doesn't that sound like the sign of the hotel? We didn't even inspect it. They told us we didn't inspect it. But you insured, what we're going to tell you is it's burned out lights. HSB sends them the report that says, you know, we can't tell that this isn't what the insured says it is. Electrical surge. But electrical surge isn't ours. That's under your policy. You didn't reinsure that with us. And we hear no coverage. And they take no action to try and find out if it's what HSB told them it could be. That's why we focused on Rawlings. This is the holding of information that could help us let us know what we have. And because it's not good for them, we never got it. And in the sign case, we got a story that just absolutely wasn't true and had no basis. That's the state of mind. And in terms of the multiplier, I'm running out of my time. Do you have more questions, Judge Gilman? I noticed there's a case, what was it called? Again, Southwest Airlines. Hudgens. Hudgens, right, where it was a one-to-one ratio. Those are the bounty hunters. Exactly. The bounty hunters that Southwest Airlines didn't control. I mean, you look at the factual records and you look at any of the Arizona appellate cases where there's been a reduction to some ratio, the one thing you see in every one of them is a runaway jury. And in that, this case is so unlike any of those. Because in those cases, like Hudgens, I think they gave $6 million. The compensatory damages were incredible. And in Arellano, they talk about the presence of a hidden penal award in the compensatory award affecting how you do those. Here, we put on evidence. We're not here saying the jury needed to accept it. But we put on evidence, even though we were hindered by the delays in the investigation and the adjustment, of $2 million in compensatory damages. Repairs needed, the whole roof, all of that stuff. This jury listened and gave us $144,000. That's not the kind of jury that all of these doctrines from appellate review of punitive damages are unspokenly but very really in place to correct. They were sober-sighted in that. And again, if you see in Hudgens and those kinds of things, then the inflated compensatory becomes a plural millions punitive verdict every time. Right? I mean, that's the true indicator. And again, here, they gave us $144,000. Unlike all of us, they're not instructed in ratios. But they're told and they're dealing with a big insurance company and they've heard a lot of stuff that could have gotten them angry and they gave a $500,000 punitive damage award. Counsel, your time has expired. Thank you. Thank you. Do you have any further questions? I think not. Thank you. Mr. McCarthy, you have a little bit of rebuttal time remaining. Thank you. I wanted to answer your question about where is it. There are statements scattered throughout the opening brief, but probably the most direct statement is the award is undeserved punishment for conduct 36. The award is undeserved punishment for conduct that caused no distinct harm. But you made that in the context of the ratio argument. That's why none of us focused on it as a statement. Your argument today is that the award of zero damages for bad faith means there can be no punitive damages award whatsoever. You were making the argument you just mentioned, and it is a passing reference, in the context of the ratio is out of whack. And that's totally different from the argument you presented to us for the first five, seven minutes today. No, that statement appears in the conclusion, which talks about the arguments made throughout the brief. You're right. It does show up in the argument about the ratio, because if the ratio is zero, that, too, tells you something. But that wasn't your argument. You made two very distinct arguments in your opening brief. One was there's no evidence of an evil mind and, therefore, no punitive damages. And then, even assuming punitive damages are okay, the ratio is too high. Those were your arguments. And you had lots of information underneath those, but I don't see any other arguments besides those two in your opening brief. Well, incorporated into both of those arguments is the idea that, if the conduct at issue doesn't cause any distinct harm, doesn't cause any harm beyond the contract damages, then that tells you it's really not worthy of punitive damages. Thank you, counsel. Your time has expired. Thank you. The case just argued is submitted, and, once again, we appreciate the helpful arguments from both parties.
judges: Gilman, Graber, Watford